Our final case for argument this morning is James v. Yarbrough. Good morning. May it please the Court. My name is Mary Pogalis. I represent the petitioner, Charles James, in this habeas action. We're here on this Court's Certificate of Appealability to review the question of a violation of Mr. James' Sixth Amendment rights to confront a crucial witness against him at his jury trial. There is a single question. It's based on Crawford v. Washington and the prior cases of Ohio v. Roberts and Barber v. Page, which is, was this witness, Yolanda Smith, who testified to the defendant's full confession with many, many details, unavailable? Was she unavailable because her testimony came in not through her personal presence at trial but through the reading of her transcript from her preliminary hearing testimony? Was she unavailable despite good-faith efforts undertaken prior to trial by the prosecution to produce her? In other words, was his Sixth Amendment right honored as the law requires? The answer is that the prosecution acted at best with indifference to his constitutional rights to confront her and at worst with an almost purposeful effort to keep her from appearing at trial. I don't know where the answer lies along that gauge. It's somewhere in there. It is nowhere near good faith or what the California Supreme Court refers to, the California courts, as due diligence. Of course, I briefed this extensively. It's very fact-dependent, case-by-case analysis here, and I don't have time in my 10 minutes to go through all of that. Certainly, if you have questions on specific areas, I will do that. But in the context of a habeas, my position is that the trial court and the California courts of appeal unreasonably applied a very clear United States Supreme Court precedence because they basically countenanced no showing of good faith or due diligence. The trial court essentially said, you don't have to make that showing because I see that there was a warrant out for her arrest, and I will find that she has been affirmatively avoiding arrest on that warrant. So even if you had tried, even if you had made good faith efforts, they would have been futile. That's letting the government out from under its own. Was it just the warrant? Because there were other times she demonstrated unreliability in a lot of different ways, that, you know, I'll meet you here and then she doesn't come. Well, I'll meet you there and she doesn't come. So it may, do you think that those facts had anything, contributed anything to the court's findings that they weren't going to get her no matter what they did? Well, if they did, it's not in the court's findings. The court more than once in the record said specifically, I am making this finding based on this warrant. That's how you're going to get this in. Because later on — Does the record show when that warrant was issued? No. This is the problem. The defense attorney attempted to find out. The prosecutor refused to provide it. And the judge agreed with that. So as I say, first, it's an unreasonable application of the law because the government was totally relieved of its duty to show good faith or due diligence. And it was based upon an unreasonable factual finding because there's nothing in the record to support it. Do we know what kind of warrant it was? I'm sorry? Do we know what kind of warrant it was? It was something about a credit card. That's what they said. The defense attorney was never allowed to see it. It never was put in the record. Do we know if it was in the warrant system? Well, that was the testimony of the officers, that they found it on their computer like three days before trial began when they finally began looking for her. There is nothing in the record to say when that warrant came out. Well — I don't know how a trial court could conclude that she had been actively avoiding arrest on that warrant for the whole six weeks since trial had been set without something in the record to say when it issued. Do we know which case it came out of? No. It was from some court, I think, down the peninsula, San Mateo or some place south of us. It was a terrible record on which to make this kind of finding and deprive this man of his right to confront this witness. And that was it. Was the trial court told anything about that warrant? Where did we learn anything about that? The trial court was told by the — well, they began what they called due diligence hearing, a due diligence hearing outside the presence of the jury, where the prosecution put on witnesses to try to establish all the good-faith efforts they claimed to have made. In the course of that, the testimony came in that the officers, just before trial began, two days at the most before the jury was selected, maybe three days, had gone to the computer and found this warrant. It's $100,000, and eventually the information came out it had something to do with a credit card fraud. The defense attorney tried, specifically asked, I need to know the date. When did it come out? Well, the judge said, I can't make the government, I can't make the district attorney investigate their case more than they want to. The judge never asked to see the warrant, I don't believe. If he did, it didn't get put in the record. I don't know why it was such a secret, but it was like this big secret, which, really, you kind of wonder. I mean, under all the facts of what went on here, a person could really be excused for thinking that there was an affirmative effort here to set up a good-faith showing that wasn't based on anything valid, and to let the judge go off on this red hearing for which there was no evidence. This is another prong on which the habeas relief is definitely something that should be granted in this case. Counsel, the court of appeals made a number of findings about the efforts. Is it your position there's no support for those findings in the record? There is support that some of these efforts were made. It's basically the appellate court adopted the trial court's ultimate finding, which is it would have been futile. Now, they don't say, the appellate court did not say specifically because of this outstanding warrant, but it was clear they were going right down the line with the trial judge, and that's what the Federal District Court judge said also. It would have been futile. And the only grounds on which anyone could say that would have been the trial court's identification of this warrant, but the trial court had no grounds for saying that because, first, there was no showing she was avoiding it. The only evidence in the record at all about her knowledge of that is that the agents working for the prosecution in the day or two or three before trial, they informed her. So if she knew about it, that's all we know about how she might have known is that they told her. Now, what did they think was going to happen when that information got through? It was a really appalling government effort. And I say that, you know, not as James's attorney. I was six years a deputy district attorney. I was 14 years an assistant United States attorney. I have been on that side. I have dealt with informants where I just hold my breath until they're off the stand at trial. You have to reach the prejudice prong as well. Yes. That, I think, is very important. So does that – does this – did her testimony make a difference? Yes. Yes. A huge difference. I see, though, I only have one minute and 17 seconds left. I guess I'll use it on this because it's – Was she a critical witness or just – She was absolutely crucial. Just an important witness or – She was crucial. That's why they pushed so hard to get her in at the preliminary hearing. They continued it over and over again to get her in there because without her, they had no physical evidence. They had alibi testimony, disinterested alibi testimony, from the people at the hotel that he was there from 2.55 to 3.25 when the teller at the second bank robbery said it was 3 o'clock, very close to 3 o'clock, when the robber entered the bank. He has very strong alibi evidence. He had other witnesses. He made a proffer, although they did not testify, other witnesses who had identified other people at the lineup other than him. The two eyewitnesses, their testimony had many inconsistencies, which I point out in my opening brief in footnote 6 as well as on page 9. The most distinctive thing that those witnesses talked about was his speech and his walk. That's how they identified him. And I would point out to you that a black person cannot mimic an Asian person or a white person. You know, a person with brown eyes can't mimic someone with blue. A 6'6 person can't mimic a 5'5 person. But anyone can mimic a walk. Anyone can mimic a speech. These are not things that are specific to this person. And had Yolanda Smith living in a hotel full of crack users and crack addicts and crack dealers decided that she wanted to set up someone to cover, I don't know, I'm speculating, but these are very real possibilities here and things that could have gone with this trial. She could have done it. She could have gotten someone to mimic his walk. There's no physical evidence. There's no surveillance photos. The one that's there, even the prosecutor said to the jury, don't look at that. It was so bad you couldn't tell. The bank robber had on, you know, the baseball cap and the big bulky jacket, all these things that bank robbers do to hide their identity. Without Yolanda Smith, they had one eyewitness at each bank with inconsistent testimonies on certain points who were relying on physical characteristics that could be easily mimicked. Without her, they had not only not a confession, which is huge, they had no money, no gun, no clothing. Not without Yolanda Smith, no clothing. No one could put him there in the location of the banks. He got no bike. They had nothing. When they went to his apartment to arrest him, I think it was early the next morning, they found nothing. They didn't even go look for a search warrant. They didn't look for prints. When they grabbed that coat out of the trash that Yolanda Smith led them to, they didn't look for any forensic evidence. This is one of the weakest prosecution cases. I know why they did not want to proceed without her. All right. Thank you. I'll let you have another minute for rebuttal. Thank you. May it please the Court, Michelle Swanson, Deputy Attorney General for Respondent. The main question in this case is whether the California Court of Appeals unavailability finding was a reasonable application of clearly established Supreme Court law. Petitioner disagrees that this is the standard of review. In both the opening brief and the reply brief, Petitioner states that the review is de novo. Petitioner cites three Ninth Circuit cases for this proposition, but it is clear that all three of those cases are pre-AEDPA cases. The deferential standard does apply in this case. Under clearly established Supreme Court law, before a witness can be found unavailable, the court must make a finding that the prosecution's efforts to secure that witness were made in good faith. This involves a broad test of reasonableness. In applying the standard and finding the prosecution's efforts were reasonable in this case, the state court reasonably applied this clearly established Supreme Court law. Petitioner disagrees with the state court's determination in this case, arguing that the prosecution should have begun their efforts earlier and that they should have undertaken additional efforts to locate the witness. The state court specifically addressed each of these contentions and reasonably rejected each of them in turn. As for the timeliness issue, the state court noted that while the prosecution could possibly be faulted for not having started its search earlier, any efforts started earlier would have been futile. The state court of appeals decision did not rest just on the warrant. The court actually states the efforts to locate Smith and secure her testimony, if not exhaustive, were at least reasonable under the circumstances. And such a conclusion was certainly reasonable, given Smith's efforts in avoiding police officers in the week before trial, as well as her outright refusal to testify at trial. In addition, there was a warrant out for her arrest, which she knew of. How do we know she knew of it? Because Officer Robertson testified at a due diligence hearing that when he spoke to her, she already knew about the warrant and she was concerned that officers wanted to arrest her. And officers in this case tried to assure her that they just wanted her to appear at trial. They did not say that they were interested in arresting her on the warrant. The officer testified? Yes. And that is at Could you just point me to the part of the transcript where the officer testified that she acknowledged that she knew the warrant was outstanding? Yes. And that is in the excerpts of record, page 70. Page 70. Petitioner assumes that if the prosecution had started looking for Smith earlier, they would have been able to secure her presence at trial. Again, her uncooperative attitude with the police in the week before trial demonstrates that this was not true. In addition, because that arrest warrant was in the system at the time of trial, there's no indication that Smith would have wanted to appear at trial and risk being arrested on that warrant, regardless of when it issued. Thank you, Judge. Judge Hewitt. Counsel, let me ask you this question for my benefit. Under federal law, a trial judge can consider hearsay in deciding availability of a witness. Is that true under California law? Sorry, can you repeat that? I'm having trouble hearing you. Okay. I say in the federal system, a trial judge who is determining whether or not a witness is available can consider hearsay, I think. Is that true under California law? I am not sure about that, but I know that the trial court in this case did consider officers' statements regarding what Smith told them. As for whether the prosecution should have undertaken additional efforts to secure Smith's presence at trial, the court reasonably concluded that additional efforts were not necessarily so long as the efforts undertaken were reasonable. The court's conclusion was a reasonable application of clearly established Supreme Court law, which requires only that the prosecution's efforts be reasonable, not necessarily exhaustive. The state court's harmless error finding was also a reasonable application of clearly established Supreme Court law. Smith's testimony was substantially Do we have Supreme Court cases talking about what efforts are reasonable, how many efforts have to be made, anything like that? No, we just have a broad standard of reasonableness. The Robert O'Reilly Roberts standard. It is Barber v. Page, I believe, and California v. Green, Harlan's concurrence, which sets those standards. Smith's testimony was substantially impeached by the defense in this case, rendering her testimony of dubious value. Additionally, there was strong evidence that Petitioner was the bank robber. We had positive identifications from tellers at both branches. They both immediately spotted him when he was walking into the lineup and knew that it was him. They positively identified him at the lineup. They noted his distinctive limp. One of them noticed a sloping shoulder that she had noticed earlier during the bank robbery, and they both recognized his voice. They also both positively identified him at the trial, and they were unequivocal in their identifications. There were also surveillance photos from both banks of the robber. Based on all of this evidence, the state court reasonably concluded that any error in admitting Smith's prior testimony was harmless. Unless there are any further questions, I'm prepared to submit the matter. I'm sorry. I don't have it. Thank you. Thank you. Ms. Smith. On the harmless error standard, I just want to emphasize to you the law in the habeas matter. It's not whether there was enough evidence to support the verdict without that. The standard is whether the evidence that came in here improperly had a substantial and injurious effect or influence in determining the jury's verdict. This was extremely powerful evidence, and the government was determined that it must have it to proceed with the trial, and I understand that. I don't know a district attorney who would have gone to trial with a single eyewitness with inconsistencies in their testimony on this kind of evidence when you had alibi evidence also. And I just want to finish with an anecdote. I hope you'll allow me to do this. I had been a prosecutor for probably four or five years. We had a robbery trial. A single white victim who was robbed at very close range at gunpoint by a single black male. We went through the trial. It was very intense. He was absolutely convinced that this was the man who had robbed him. The jury acquitted, and I, of course, was convinced that there had been some miscarriage of justice here. However, in a completely unrelated situation about a year and a half later, another young black man from the same area confessed to having committed that robbery. You all know that eyewitness testimony is the key. The possibility of eyewitness identification. Your counsel said that you take the view that we decide reasonableness de novo. Doesn't EDPA require us to say that the State Court of Appeal in saying that the efforts that were made were reasonable has to be an unreasonable? Well, I really disagree with their position on that. I've cited the cases I believe set the standard of review here, which is de novo. It's a mixed question of law and fact. There's more than one case that says We reviewed de novo, what the district court did. Yes. And the district court, of course, wholly adopted what the California Court of Appeals did, which wholly adopted what the trial court did. So we're dealing with the same findings and the same record and the same law all the way along. But your argument, as I understood your argument, though, it also was that there was an unreasonable determination of the facts. Yes. Yes, as I said, there's nothing to support the judge's entire finding, which is she was avoiding arrest on this warrant for that whole six weeks that they had notice of the trial. I mean, that's what the finding has to be. Apparently, there was one of the officers who did testify at the hearing said that there was some conversation about the warrant. He testified that when he spoke with her, in his opinion, she already knew about the warrant and didn't trust him and thought he might be trying to arrest her. He also, at one point, did testify that he told her he wasn't – that wasn't his interest in arresting her. But later on, he also testified that he never told her that he would not be arresting her. They didn't take that extra step of reassuring her that she could come in and testify, and they wouldn't act on it. But even so, we don't know when that – when she learned about it. We don't know if any efforts were made to execute it. We don't know when it was issued. We don't know anything. The trial court knew nothing and simply speculated. There's no other word for it, really. Well, we're really reviewing the court of appeal and its determination. It talked about the warrant, but then it also talked about the efforts to contact her, the six telephone calls, the three meetings they set up with her, all of which she refused – failed to come to. And then the court of appeal says these efforts are reasonable under the circumstances. Under the circumstances. Right. And it's clear that under the circumstances means what the trial court found, which is this warrant was out and she was avoiding it. Under those circumstances, what they tried to do was reasonable. Well, those circumstances were never established by anything like either admissible evidence or even hearsay. There was nothing – the officer was asked, do you know when it issued? No, I don't remember that. And then as the defense attorney continued to ask the court to see it, to tell him what the date was, and the prosecutor wouldn't release it, and there's nothing in the record to say that it didn't come out, that she didn't find out about it the day before the officer talked to her. Well, then what were they doing in the six weeks between the trial setting and that conversation? There's nothing to show that they couldn't have, as soon as they knew the trial date, go out there and try to find her, that they couldn't have gotten her in. You know, the record reflects they spoke with her grandmother, they spoke to her on the phone.  Yolanda Smith. Yolanda Smith. They never went back to see her again. They never asked her who this relative was in Vallejo. They never asked for addresses or information. I mean, I can't – Do you have a phone conversation with her? With? Smith. There were many phone conversations, all of which were, I don't want to testify, well, let's meet at Starbucks. Well, I mean, how many times are you going to do that? They waited a week into trial before they even put information out on the street, and there was no subpoena issue. What were they going to do if she showed up at Starbucks? Kidnapper? There was never even a subpoena issue. What was Officer Robertson going to do? Talk her into it? It was bad. I gave you more than one minute. That's fine. Thank you. Thank you, Your Honor. Thank you. The matter will be submitted. And it will adjourn our session for today. We'll pick up again tomorrow. Thank you very much. Good afternoon. Good afternoon.  Thank you. Thank you. Thank you. Thank you.   Thank you.
judges: Canby, Cox , Paez